UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| GUARDIAN FLIGHT LLC, et al., : | |
| : | |
| *Plaintiffs*, : | |
| : | |
| v. : | No. 3:24-cv-680 (MPS) |
| : | |
| AETNA LIFE INSURANCE COMPANY : | |
| INC., et al., : | |
| : | |
| *Defendants*. : | |

ORDER

Having heard argument on Aetna's Motion to Compel, ECF 195, which seeks plaintiffs' compliance with Interrogatories ("ROG") Nos. 1-3 and 5-8 and Requests for Production ("RFP") Nos. 1-2 and 6-14, the Court orders as follows.

Identification of potential witnesses

ROG 1-2 seek identification of individuals who prepared or provided information used in plaintiff's Notices of IDR initiation and Submissions of Offer to the IDR entities. The Court sustains plaintiffs' objection that "provided information used" is vague, but their relevance and undue burden objections are overruled. **ROG 1-2 are hereby revised to require plaintiff to identify individuals who prepare IDR notices or submissions or who supervise or provide substantive input on the content of those notices/submissions.**

ROG 5-6 similarly seek identification of Individuals or departments responsible for evaluating initial payments and deciding whether to initiate open negotiation or IDR. Plaintiffs' answers are inadequate. To the extent that they omitted information by reading "or" disjunctively, Local Civil Rule 26(d)(2) clarifies that "or" must be read more inclusively, such that plaintiffs must identify individuals in addition to departments. **Plaintiffs shall identify individuals responsive to ROG 5-6.**

In the Court's view, these individuals may possess potentially relevant information regarding assessment of the reasonableness of initial payment offers, considerations involved in the open negotiation period, the burden and cost of the IDR process and communications with the defendants regarding reasons for delay in payment or non-payment of IDR awards. With respect to plaintiffs' slippery-slope argument that Aetna may attempt to seek disproportionate discovery from these potential witnesses concerning the merits of each negotiation/IDR submission, this ruling is without prejudice to raising appropriate objections to future discovery requests or seeking a protective order if depositions become unnecessarily repetitive, cumulative or oppressive.

<u>Costs incurred in challenging initial payments</u>

ROG 7-8 seek plaintiffs' average cost of open negotiation and IDR, with breakdown of specific cost components.

RFP 10-11 seek "records, reports, or summaries" that detail plaintiffs' average costs incurred in initiating open negotiation or pursuing IDR.

RFP 12 and 14 seek reports and analyses of total and average expenses incurred in challenging initial payments, including economic impact.

RFP 13 seeks communications discussing costs associated with challenging initial payments.

Plaintiffs object that, per their recently disclosed damages analysis, they are not seeking direct compensation for expenses incurred during the process created by the No Surprises Act ("NSA") but, instead, are merely seeking to recover damages for unpaid and late-paid awards. However, this downplays both plaintiffs' theories of liability and their damages claim.

Plaintiffs CUIPA/CUTPA claim alleges, in part, that Aetna's "unreasonably low initial payments are unfair and not good faith attempts to effectuate equitable settlements." Am. Compl., ECF 109 ¶ 44.  In support, plaintiffs allege that "Defendants make low initial payments hoping that providers will be too busy to file IDR proceedings or will miss one of the NSA's strict deadlines.  This forces Plaintiffs to go through the IDR process, which is burdensome and costly, on every transport." *Id.* ¶ 21.  As a remedy, plaintiffs seek punitive damages in addition to attorney's fees, *id.* at 14, both of which are separately available under CUTPA.

These allegations put into dispute plaintiffs' costs incurred in challenging initial payments and undertaking open negotiations and IDR submissions and whether there is any resulting duress that Aetna allegedly creates or leverages.  Notwithstanding plaintiffs' assertion that the costs are limited to two distinct administrative fees required in the IDR process, which they do not seek to recover, defendants are entitled to explore the veracity of the allegation that Aetna is leveraging IDR costs and burdens to pressure plaintiffs to accept inequitable claims settlements, which is a foundational component of plaintiffs' unfair insurance practice claim.  The information is also potentially relevant to Aetna's defense theory that plaintiffs' frequent invocation of the IDR process is a deliberate business strategy rather than the result of any unfair practice by Aetna.  **Accordingly, Plaintiffs shall comply with ROG 7-8 and RPF 10-14.**

<u>Information regarding plaintiffs' claims against non-party insurers.</u>

ROG 3 seeks statistics on the frequency of plaintiffs' challenges to initial payment amounts and the results of those challenges.

RFP 1 seek plaintiffs' communications with the Departments of Treasury, Labor and HHS re: unpaid/late-paid IDR awards.

RFP 6, 8 and 9 seek "records, reports, or summaries" evidencing statistics concerning the number of initial payments plaintiffs have challenged, plaintiffs' success rate at IDR, and the number of default wins.

RFP 7 seeks plaintiffs' internal communications discussing the volume of initial payments that plaintiffs have challenged.

Aetna seeks responsive information as to all health insurers to whom plaintiffs have submitted claims.  As to some of these requests, plaintiffs agreed to provide information only as to Aetna, and objected in full to others.  At oral argument, Aetna focused on the relevance of the requested information, contending in particular that statistics, including whether plaintiffs have difficulty obtaining timely payment of IDR awards from other insurers, would tend to show (a) that plaintiff is reflexively challenging every initial payment, i.e., that plaintiffs are using IDR burdens as negotiation leverage like they allege Aetna is doing, (b) that Aetna's claims handling practices are in line with industry standards; and (c) that the late/non-payments of IDR awards are caused by flaws inherent in the administrative process, not by Aetna.

The Court is not persuaded that this case warrants such expansive discovery into the business practices of non-parties and their relationships with plaintiffs.  While this matter involves six plaintiffs and two major health insurance carriers, the claims made are relatively straightforward.  Plaintiffs allege that Aetna makes inequitably low initial payments, which forces plaintiffs to utilize the IDR process to obtain what they are owed, and then delays or does not pay the IDR awards, in the hope that plaintiffs will either accept the initial payments to avoid the hassle or will make a procedural misstep in the IDR process.  In defense, Aetna argues that plaintiffs invoke the IDR process as a deliberate business strategy and contends that the delays in payment or non-payment are caused by external factors, including structural flaws in the IDR administrative process.  These claims and defenses do not require sweeping, time-consuming and costly discovery as to plaintiffs' interactions with non-party insurers that are at best marginally relevant and would require further contextual discovery from the non-party insurers to draw any reliable conclusions.

First, plaintiffs' claims with defendants Aetna and CIGNA alone provide a sufficiently large sample for analysis of whether plaintiffs are reflexively challenging every initial payment, as Aetna contends.  Second, bare statistics concerning plaintiffs' rate of IDR challenges/success with other insurers and whether plaintiffs struggle to obtain timely payment of awards from other insurers will not, by themselves, demonstrate that Aetna's initial payments are equitable or that a flawed administrative process is the culprit.  Even if other insurers' statistics are comparable to Aetna's, it cannot automatically be assumed the similarity is for the same reasons.  Statistics will not shed light on the internal processes of any of these insurers, or their thought process on setting initial payments, or the systems they have or do not have in place for NSA compliance.  Some understanding of the dynamics of each plaintiff's relationship with each non-party insurer and each insurer's internal practices would be necessary to determine whether there is any meaningful comparison to Aetna.  In other words, further contextual discovery from plaintiffs regarding other insurers – and potentially <u>from</u> those insurers – would be necessary to construct, and rebut, the defense theories that Aetna has outlined.

Lastly, the Court is skeptical of Aetna's theory of relevance that if its claims practices under the NSA are the same as other insurers, then there can be no bad faith.  Plaintiff does not cite to any case that supports such an "everyone else is doing it" defense to a bad faith claim, and the Court has found none.  To the extent that Aetna believes that its initial payments are equitable or that structural flaws in the IDR process are the cause of any untimely payments, it may offer such information in discovery and at trial to rebut notions of bad faith or unfair practices and may rely on its own experience and that of co-defendant CIGNA as corroboration.  The Court concludes that the cost and effort of discovery into plaintiffs' data and interactions with other non-party insurers under the NSA is not proportionate to the needs of the case and the lack of proportionality substantially outweighs the marginal relevance of any such data.

**Accordingly, Plaintiffs shall comply with ROG 3 and RFP 1, 6-9 only with respect to their interactions with Aetna, although plaintiffs are free to also disclose information pertaining to defendant Cigna to the extent promised during the meet-and-confer process.**

<u>Communications with Departments re: administration of IDR process.</u>

RFP 2 seeks communications between plaintiffs and the Departments regarding the administration of the IDR process, such as complaints about administrative burdens, transparency, or certified IDR entities.  As drafted, this request is vague and overly broad and could potentially sweep up every communication plaintiffs have had with the Departments, including irrelevant communications.  It also is disproportionate to the extent that it seeks information concerning non-party insurers.  **Plaintiffs' objections to RFP 2 are sustained.**

<u>Conclusion</u>

By **January 31, 2025,** plaintiffs shall comply with ROG 1-3, 5-8 and RFP 1, 3, 6-14 as limited above.  If compliance requires the development of ESI parameters, plaintiffs shall provide Aetna with proposed search terms and custodians by **January 31, 2025**, and shall complete production by **February 15, 2025**.

Additionally, as discussed at oral argument, defendants Aetna and Cigna shall complete their production of non-search-term discovery by **January 31, 2025**, and shall complete their production of search-term discovery by **February 14, 2025**.

This is not a recommended ruling.  This is an order regarding case management which is reviewable pursuant to the "clearly erroneous" statutory standard of review.  28 U.S.C. § 636(b)(1)(A); Fed. R. Civ. P. 72(a); and D. Conn. L. Civ. R. 72.2.  As such, it is an order of the Court unless reversed or modified by the District Judge upon motion timely made.

SO ORDERED, this 15th day of January, 2025, at Bridgeport, Connecticut.

*/s/ S. Dave Vatti*
S. DAVE VATTI
United States Magistrate Judge
